UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ALMA E. WHEELER,

                          Plaintiff,

         -against-                                        6:16-CV-1176 (LEK/TWD)

BANK OF NEW YORK MELLON,

                          Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Pro se plaintiff Alma E. Wheeler commenced this action against defendant Bank of New
York Mellon ("BNY") pursuant to Title VII, 42 U.S.C. § 2000e *et seq.*, and the Age
Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Dkt. No. 1
("Complaint"). Presently before the Court is BNY's motion to dismiss. Dkt. No. 13 ("Motion");
see also Dkt. No. 13-3 ("Memorandum"). Wheeler opposes the Motion, Dkt. No. 21
("Response"), and BNY filed a reply, Dkt. No. 23 ("Reply"). For the reasons that follow, the
Court grants in part and denies in part BNY's Motion.

## II.    BACKGROUND[1]

### A.  Factual Background

Wheeler has held several positions at BNY since 2007, including trade specialist, client services representative, and account administrator I. Compl. at 15; Resp. at 8.[2] Although Wheeler does not explicitly allege her national origin, her résumé reveals that she attended school in Mexico and worked in that country from 1974 to at least 1994, and that Spanish is the only language in which she is "100%" proficient in speaking, writing, and reading. Compl. at 15. Similarly, while Wheeler does not clearly state her age as of the filing of her Complaint, she does say that she was "promoted [at BNY] . . . in 2010 and 2011 when [she] was 53 and 54." Id. at 12.

Wheeler's troubles at BNY began soon after she started working there in November 2007. Id. at 7. When Wheeler and her coworkers were "released to the floor" after completing mandatory training, their boss informed them that they could not share salary information with one another because some people could "have lower salaries [despite] performing the same job." Id. Several months later, two of Wheeler's coworkers, both of whom had four to five years of relevant experience, applied for a promotion but were rejected in favor of "a young, American man with only one year within the company." Id. In another incident that troubled Wheeler, her

---

[1]  Because this case is before the Court on a motion to dismiss for failure to state a claim, the allegations of the Complaint are accepted as true and form the basis of this section. E.g., Boyd v. Nationwide Mut. Ins. Co., 208 F.3d 406, 408 (2d Cir. 2000); see also Matson v. Bd. of Educ., 631 F.3d 57, 72 (2d Cir. 2011) (noting that, in addressing a motion to dismiss, a court must view a plaintiff's factual allegations "in a light most favorable to the plaintiff and draw[] all reasonable inferences in her favor"). Further, because Wheeler is proceeding pro se, the Court construes her Complaint liberally. Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009).

[2]  The page numbers for the Complaint and Response refer to those generated by the Court's electronic filing system ("ECF").

manager chose as employee of the month "a young[,] . . . American coworker who was not on their best behavior." Id. These experiences led Wheeler to "apply to [the] other office in Syracuse where [she] was accepted." Id.

Wheeler's transfer did not solve her problems, however. In fact, she claims that the situation was worse in her new office, though it "took [her] more than 2 years to start to figure [it] out." Id. at 8. When she arrived, her team leader told her that the training at the office was subpar, an observation borne out by her experience shadowing a coworker who "found a way to keep [her] out of conversations or information that could help [her] to understand the process[,] claiming that he was extremely busy when he only handle[d] seven clients." Id. Wheeler also received inadequate training via Sametime instant messaging with a coworker in Boston whose idea of training was to pepper Wheeler with questions about finance to test her knowledge of the field. Id.

Poor training was not the only issue facing Wheeler at her new office. During her first six months at the office, she alleges, all of her coworkers were constantly complaining about their jobs. Id. And from the end of 2011 to June 2012, her team leader and unit manager "repeatedly stated [that] they cannot stand . . . th[ose] people, when speaking with Mexican clients or employee[s] located there." Id. at 8, 13. This hostility may have stemmed from a $60,000 fine BNY incurred as a result of misconduct committed by BNY's managing director in Mexico. Resp. at 9. Further, Wheeler's unit manager and team leader appear to have falsely accused her of "put[ting] in . . . some [risky] trades." Compl. at 8. Wheeler had nothing to do with the trades because she was in training when they were made, but when she explained that to her superiors, they made "poor excuses" and acted "extremely upset." Id. Around this time, Wheeler was also

left out of a welcome lunch for a sales manager, who later asked her why she had not been at the event. Id. Despite these obstacles, Wheeler's clients were "very grateful for [her] service." Id. at 9.

Wheeler's filings are replete with other examples of slights and indignities she suffered at BNY, many of which have no obvious connection to her age or national origin. The Court therefore recounts only the most salient incidents. For several months, one of Wheeler's coworkers asked her to define "equity" at every team meeting, and he refused to accept the definition she offered, which was "what the company/person owns [minus] liabilities." Id. She eventually had to print out a definition of the term from the Internet to get him to stop bothering her. Id. Despite the acclaim she received from her clients, Wheeler's unit manager failed to "recognize [her] as they usually do with other coworkers." Id. And in an attempt to make Wheeler feel unwelcome, her team leader and Yvette Allyne, one of her coworkers, "decide[d] that the[re] w[ould] not be a celebration of [her] birthday even though [they] celebrate[d] every one else['s]." Id. In lieu of a birthday party, Wheeler received a birthday card that she appears to regard as ageist. Resp. at 15. The outside of the card contains an image of two women talking. Id. at 45. One of the women says to the other, "To stay young, the doctor said to exercise and eat the right foods." Id. The other woman says, "What?!" Id. The inside of the card reveals the source of this woman's confusion: she "thought he [the doctor] said ACCESSORIZE and BUY NICE SHOES!" Id. at 46.

More significantly, Wheeler's colleagues constantly "laugh[ed] at [her] about [her] accent" and "laugh[ed] about how [she] expressed [her] thoughts either verbally or in writing . . . [saying,] "WHAT DID YOU SA[Y]?! YOU CRACK ME UP!" Id. at 15. She also

received comments such as "Wow[,] you look very good for your age," and "Shouldn't you be retired?" Id. In February 2013, Wheeler's unit manager told her that she was paid too much, though Wheeler alleges she had a low salary compared to other members of her team. Compl. at 13. On June 19, 2013, a BNY executive named Virum Rampersad was invited to discuss a book called "'[L]ook at [M]ore' for the Career Development Program." Id.; Resp. at 10. During the discussion, Rampersad said that "we need to get real" and continued, "[I]f you are older than 43 and have not reach[ed] the position that you are looking for with the company, it will be unlikely to happen." Compl. at 13. Further, at some unspecified time, Iris Denisse Ortiz, who appears to be one of Wheeler's supervisors, responded to a "neighbor[ing] team['s]" complaints about "screaming tones" in Wheeler's team's work area by claiming that Hispanic customs dictate a "high volume tone." Resp. at 10.

Despite Wheeler's "nightmar[ish]" experience at BNY, she stayed on because she enjoyed the work, which "involved speaking [her] native language with very educated clients and . . . us[ing] [her] extensive experience managing client service." Compl. at 8. Her 2012 and 2013 performance reviews were positive; they stated that she had "really hit her stride," that she had proven herself able to tackle an increased workload "with ease," and that she was "commit[ed] to the team." Resp. at 14–15. Her 2014 review was similarly positive, describing her as a "valued member" and a "mentor to our newest members." Id. at 14. In February 2013, Wheeler was named employee of the month, and in 2013 she received the "Aspire Award . . . for building/managing clients and relationships." Id. at 15.

Wheeler has continually sought promotions at BNY, and she has received two promotions to date. Compl. at 12; Resp. at 26. Yet she has apparently failed in her efforts to be promoted to

account administrator II, with several people getting the job instead of her. Compl. at 10; Resp. at 1–2. She provides a list of promotions received in her department, specifying that "[o]nly two people on the list may be above 55,"[3] and that all of them are "Caucasian/Puerto Rican." Resp. at 1. Wheeler also notes that several of the positions obtained by people on the list were not posted. Id. In September 2015, one of the individuals on the list—"Meloney D."—was promoted to account administrator II even though she had only one year of experience and a "few months as account administrator I." Compl. at 11. Meloney's age is not specified, though she is on a list in which only two individuals "may be above 55," and she is either white or Puerto Rican. Resp. at 1. Wheeler stresses that she could not apply for positions such as the one filled by Meloney that were "never posted," and she asserts that she was "equally or [more] qualified than the[ listed individuals] and in . . . good standing on [her] performance review." Id. at 2. Although Wheeler does not specify when she was promoted to account administrator I, she does say that she was promoted in 2010 and 2011, Compl. at 12, so she had significantly more experience as a BNY account administrator than Meloney did when Meloney received the promotion to account administrator II in September 2015.

On December 29, 2014, Wheeler called "the company ethics hot line" to report discrimination she felt she had experienced at the hands of two of her supervisors. Id. at 10. In January 2015, two or three weeks after the call, Wheeler was "called [in] by the security team[, which] repeatedly accus[ed her] of threat[ening] a coworker in the back stairs." Id. The accusation was false, and Wheeler repeatedly denied that she had threatened anyone. Resp. at 31.

---

[3]  Wheeler provides specific ages for only three coworkers from her list who obtained promotions: Ivette Allyne and Wilfred Fragoso, who are in their forties, and Melissa Hashemi, who is in her thirties. Resp. at 5.

Nevertheless, the security team "pressured [her] to accept something that [she] didn't do" and "treated her [like] a criminal." Id. at 10; Compl. at 10. The security team also falsely accused her of "checking at what time a coworker c[a]me[] in every day." Resp. at 31.

Later, on September 1, 2015, Wheeler received an "[i]nitial written warning of corrective action" in connection with a separate incident. Compl. at 10. She was accused of offending her colleagues on July 7, 2015, when it was she who had been offended by what her coworkers said to her. Id.; Resp. at 32. According to the incident report, with which Wheeler "totally disagrees" and which she refused to sign, one of her colleagues said she was going to Mexico, explaining that Mexico was "where she [was] from." Resp. at 33. Wheeler responded that she (the colleague) was "not Mexican as she was born in the US," and "continued to elaborate on the difference between somebody who was born in the US with parents from other countries vs. somebody who was born in a Latin country." Id. Wheeler's colleagues found these comments offensive, but again, she hotly disputes this characterization of the incident. Id. The incident write-up explains that Wheeler's "failure to correct this problem or any other violation of BNY Mellon policies or procedures may result in further Corrective Action up to and including ending [her] employment." Id.

**B. Procedural History**

Wheeler appears to allege that she filed a charge with the Equal Employment Opportunity Commission ("EEOC") on December 11, 2015. Compl. at 11. She received a right-to-sue letter on July 5, 2016. Id. at 4, 6. Wheeler filed her Complaint on September 28, 2016, id., and her application for in forma pauperis ("IFP") status was granted on October 7, 2016, Dkt. No. 4 ("October Order") at 2. The October Order also required BNY to respond to the Complaint. Id.

On December 5, 2016, BNY moved to dismiss the Complaint. Mot. BNY argues that several of the discrete acts of discrimination alleged by Wheeler are time barred, Mem. at 11, that she has failed to allege facts suggesting either that she experienced any adverse employment action or that she suffered discrimination on the basis of her national origin or age, id. at 7–10, that her failure-to-promote claims fail because she was promoted twice over the age of forty and she has given no indication that she was qualified for any of the promotions at issue or that the people ultimately chosen were not a member of her protected classes, id. at 10–11, that her retaliation claims fail because she has not alleged either an adverse employment action or a causal connection between such an action and her protected activity, id. at 13–14, and that she has not alleged a plausible hostile work environment claim, id. at 12–13.

## III. LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of the plaintiff. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-

harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer

more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader

has not demonstrated that she is entitled to relief and the action is subject to dismissal. Id.

at 678–79.

## IV. DISCUSSION

### A. Disparate Treatment

Under Title VII, it is "an unlawful employment practice for an employer . . . to

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national

origin." 42 U.S.C. § 2000e-2(a)(1). The ADEA similarly makes it "unlawful for an

employer . . . to discharge any individual or otherwise discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's age." 29 U.S.C. § 623(a)(1). "The class protected by this statutory prohibition is

limited to persons 40 years of age or older." Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d

Cir. 2005) (citing 29 U.S.C. § 631). ADEA claims are analyzed "under the same framework as

claims brought pursuant to Title VII." Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000)

(quoting Woroski v. Nashua Corp., 31 F.3d 105, 108 (2d Cir. 1994)).

In an employment discrimination action, the plaintiff bears the initial burden of proving,

by a preponderance of the evidence, a prima facie case of discrimination. St. Mary's Honor Ctr.

v. Hicks, 509 U.S. 502, 506–10 (1993). This initial burden is "minimal." Id. at 506. If the

plaintiff makes out a prima facie case, "the burden shifts to the defendant to articulate 'some

legitimate, non-discriminatory reason' for its action." Holcomb v. Iona Coll., 521 F.3d 130, 138

(2d Cir. 2008) (quoting <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973)). "If such a reason is provided, [the] plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of [unlawful] discrimination." <u>Id.</u>

A complaint alleging employment discrimination is subject to a "lowered standard of review . . . at the motion to dismiss stage." <u>Ingrassia v. Health & Hosp. Corp.</u>, 130 F. Supp. 3d 709, 719 (E.D.N.Y. 2015). "[A] discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss," but "it must at a minimum assert nonconclusory factual matter sufficient to [render its claims plausible]." <u>EEOC v. Port Auth. of N.Y & N.J.</u>, 768 F.3d 247, 254 (2d Cir. 2014). In particular, "what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 311 (2d Cir. 2015).

Construed liberally, Wheeler's Complaint alleges that BNY discriminated against her on the basis of her age and national origin by failing to promote her. The Court evaluates the Title VII claim first, then turns to the ADEA claim.

*1. Failure to Promote under Title VII*

To make out a prima facie case for failure to promote under Title VII, a plaintiff must allege:

> (1) that he is a member of a protected class; (2) that he applied for a promotion to a position for which he was qualified; (3) that he was rejected for the position; and (4) after this rejection, the position was

> filled by someone outside the protected class who was similarly or
> less well qualified than the plaintiff, or the employer kept the position
> open and continued to seek applicants.

Gordon v. City of New York, No. 14-CV-6115, 2015 WL 3473500, at *7 (S.D.N.Y. June 2,

2015). The prima facie case is flexible. For purposes of Wheeler's claim, it bears emphasizing

that the test "is subject to modification where the facts of a particular case make an allegation of

a specific application a quixotic requirement." Brown v. Coach Stores, Inc., 163 F.3d 706, 710

(2d Cir. 1998). "[T]o be excused from the specific application requirement, an employee must

demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no

knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal

procedures endorsed by the employer." Petrosino v. Bell Atl., 385 F.3d 210, 227 (2d Cir. 2004).

Put differently, "a plaintiff who has indicated an interest in being promoted to a particular class

of positions but was unaware of specific available positions because the employer never posted

them is not required to show that she applied for the specific job at issue." McKenzie v. Grand

Cent. P'ship, No. 14-CV-6549, 2016 WL 1180191, at *4 (E.D.N.Y. Mar. 25, 2016).

BNY argues that Wheeler's Title VII disparate-treatment claim fails because she has not

"identif[ied] the specific protected categories . . . to which she belongs." Mem. at 7. BNY is

correct that Wheeler does not list the protected groups to which she belongs. But Wheeler is

proceeding pro se, and the Court must construe her pleadings liberally. E.g., Boykin v. KeyCorp,

521 F.3d 202, 214 (2d Cir. 2008). Wheeler's résumé states that she attended school in Mexico

and that after leaving "Instituto Bancario e Industrial," she spent at least twenty years working in

Mexico. Compl. at 15. The résumé further suggests that Spanish is her first language. Id. And

several of the incidents Wheeler relies on to support her discrimination claim involve statements

about Mexico or Mexicans. E.g., id. at 8, 10 13; Resp. at 32–33. The Court is comfortable inferring from these facts that Wheeler intended to allege that she is Mexican. See Volmar v. Cold Spring Hills Ctr. for Nursing & Rehabilitation, No. 07-CV-1418, 2009 WL 2984194, at *4 (E.D.N.Y. Sept. 14, 2009) (noting that, while the pro se plaintiff did not allege her protected class, the court had reviewed the record and "found a statement by Plaintiff during her deposition that reveal[ed] that Plaintiff [wa]s Black").[4] Of course, if the Court's inference is incorrect, Wheeler may move to amend her Complaint to allege her true national origin.

BNY also argues that Wheeler's Title VII failure-to-promote claim must be dismissed because her Complaint "fails to plead sufficient facts to establish that she was qualified for any position she did not receive . . . or that the person who was selected for the position was not a member of her protected class." Mem. at 11. The Court agrees that Wheeler's Complaint exhibits these deficiencies. But Wheeler's Response pleads enough additional facts to save this claim from dismissal, and since she is proceeding pro se, the Court can consider those additional facts in deciding BNY's Motion. See Ibok v. Sector, No. 05-CV-6584, 2006 WL 302336, at *1 n.1 (S.D.N.Y. Feb. 9, 2006) ("The Court may consider the factual allegations in plaintiff's Response to supplement those in his complaint because of the liberal standard afforded to the pleadings of pro se litigants.").

Wheeler's prima facie failure-to-promote case is straightforward. She alleges that she sought promotion to account administrator II. Compl. at 10; Resp. at 1–2. Indeed, she had applied several times for the promotion. E.g., Compl. at 10; Resp. at 7. To take one example of

---

[4] If Wheeler is Mexican, she belongs to a protected class. See Warren v. City of Carlsbad, 58 F.3d 439, 442 (9th Cir. 1995) ("Warren belongs to a protected class because he is of Mexican descent.").

the discriminatory treatment Wheeler allegedly suffered, in September 2015, Meloney D. was promoted from account administrator I to account administrator II. Resp. at 1. This position was never posted, and therefore Wheeler could not apply for it. Id. at 1–2. Meloney is either Caucasian or Puerto Rican, and she had only one year of experience and a "few months as account administrator I." Compl. at 11. Wheeler, on the other hand, had several years of experience as an account administrator I, id. at 12; Resp. at 8, and she received glowing performance reviews during that time, Resp. at 14–15. Wheeler has provided what appears to be an official description of the duties of an account administrator II, and they seem to entail the type of client-service work with which Wheeler had significant experience. Id. at 22. The formal qualifications for the position include a "Bachelor's Degree or equivalent" and "[t]wo to four years experience," id., both of which Wheeler appears to possess, Compl. at 15.

These allegations suggest that Wheeler was qualified for an unposted position in which she had indicated her interest and which ultimately went to a less qualified person who was not Mexican.[5] "The burden on a plaintiff to show qualifications at the prima facie stage is quite low, and she need only show that she 'possesses the basic skills necessary for performance of the job.'" Thelwell v. City of New York, No. 13-CV-1260, 2015 WL 4545881, at *13 (S.D.N.Y. July 28, 2015) (quoting De la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 20 (2d Cir. 1996)). Wheeler's glowing performance reviews as an account administrator I, along with the years of experience she had in that position and her educational and work

---

[5] Caucasian does not denote a national origin. See Ukshini v. Comity Realty Corp., No. 15-CV-6214, 2016 WL 1733468, at *2 (S.D.N.Y. Apr. 29, 2016) (distinguishing between the plaintiff's "race, Caucasian, and national origin, Albanian"). Nevertheless, in light of Wheeler's pro se status, the Court construes her statement that all of the employees on the list, including Meloney, were Caucasian or Puerto Rican to mean that none of them were Mexican.

background, are enough to show that she was qualified for promotion to account administrator II. And while Wheeler did not apply for this particular promotion, that does not defeat her prima facie case. She made clear that she was interested in receiving the promotion by applying for the position on multiple occasions, Compl. at 10; Resp. at 1–2, and it appears that she even had a conversation with her managers in which they specifically mentioned the possibility of an opening for account administrator II in the future, Resp. at 7. In other words, Wheeler has "satisf[ied] her pleading requirements by alleging that she indicated a general interest in being promoted to . . . [a] position [that was never actually posted]." McKenzie, 2016 WL 1180191, at *5. Finally, Wheeler has alleged that she was better qualified than Meloney for the promotion to account administrator II. As noted above, Wheeler had several years' experience as an account administrator I—during which time she received favorable performance reviews—while Meloney had only a few months' experience in that position. Taken together, these facts are more than sufficient to state a plausible Title VII failure-to-promote claim.[6]

### 2. Failure to Promote under the ADEA

As noted above, "[t]he familiar . . . burden-shifting analysis used in Title VII cases applies in the ADEA context as well." Witkowich v. Gonzales, 541 F. Supp. 2d 572, 578

---

[6] Since the Court finds that Wheeler has stated a claim under Title VII for failure to promote based on a discriminatory act that occurred in September 2015, that claim cannot be time barred even if the Court accepts BNY's unsubstantiated assertion that Wheeler filed her EEOC charge on January 15, 2016. Mem. at 12. BNY provides no citation for this date, and Wheeler appears to allege that she filed her charge on December 11, 2015. Compl. at 11. In any event, even if the charge had been filed in January 2016, a discriminatory act that took place in September 2015 would clearly be timely. See McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 75 (2d Cir. 2010) ("Title VII's administrative exhaustion provision requires that any complaint be filed with the EEOC within 300 days of the alleged discriminatory act." (citing 42 U.S.C. § 2000e–5(e)(1))).

(S.D.N.Y. 2008). To establish a prima facie failure-to-promote case under the ADEA, "a plaintiff must show that he was a member of a protected class, that he was qualified for the job for which he applied, that he was denied the job and that the denial occurred under circumstances giving rise to an inference of impermissible discrimination." Id. Where, as here, the plaintiff alleges that she was not promoted to positions that were eventually filled by other individuals, she may raise an inference of discriminatory intent by "show[ing] she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." Martinez v. Davis Polk & Wardwell LLP, 208 F. Supp. 3d 480, 486–87 (E.D.N.Y. 2016) (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)). "In the context of a promotion, that means comparing the qualifications of the plaintiff with those of the person promoted." Id. at 487.

A plaintiff may also create an inference of discriminatory intent by pointing to verbal remarks that are "probative of discrimination." Testa v. Carefusion, No. 14-CV-5202, 2016 WL 4099113, at *5 (E.D.N.Y. Aug. 2, 2016). In evaluating whether a remark is probative of discrimination, courts consider four factors:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

Henry v. Wyeth Pharm., 616 F.3d 134, 149 (2d Cir. 2010) (collecting cases).

BNY is correct that Wheeler's pleadings lack facts suggesting that she was denied any promotions because of her age. Wheeler prefaces her list of promotions received by employees in her department by saying that "[o]nly 2 people o[n] the . . . list may be above 55," Resp. at 1, and

it appears that Wheeler was approximately fifty-nine years old when she brought this lawsuit in September 2016, Compl. at 12. But she provides specific ages for only three coworkers from the list who obtained promotions: Wildredo Fragoso and Yvette Allyne, both of whom "claim to be Puerto Rican and [are] maybe in their 40s," and Melissa Hashemi, "who claim[s] to be Caucasian [i]n her early 30's." Resp. at 5. Fragoso was promoted from account administrator I to account administrator II in April 2012, so any discrimination claim based on that promotion is time barred even if Wheeler filed her EEOC charge in December 2015. See McGullam, 609 F.3d at 75 ("Title VII's administrative exhaustion provision requires that any complaint be filed with the EEOC within 300 days of the alleged discriminatory act."). Any claim based on Hashemi's promotion is similarly time barred because she received her promotion in 2013. Resp. at 4. Allyne was promoted from account administrator II to "CSSI" in February 2015. Id. at 1. Wheeler cannot premise her ADEA failure-to-promote claim on that promotion, however, because she has not alleged any facts about what "CSSI" entails, the qualifications expected of applicants for that position, or Allyne's qualifications for the position. See Adams v. Foot Locker Retail, Inc., No. 08-CV-5627, 2008 WL 5068965, at *1 (S.D.N.Y. Nov. 19, 2008) ("Plaintiff's complaints do not contain any specifics regarding the positions he applied for, his qualifications, or the circumstances under which he failed to obtain the positions. Without such basic details, the complaints must be dismissed for failure to state a claim."). These gaps in Wheeler's pleadings prevent her from showing that "she was similarly situated in all material respects" to Allyne, her purported comparator. Martinez, 208 F. Supp. 3d at 486–87 (quoting Graham, 230 F.3d at 39). That defeats her attempt to raise an inference of age discrimination by pointing to Allyne's promotion.

Nor can Wheeler premise her ADEA failure-to-promote claim on the ageist remarks and actions she describes in her pleadings. The allegedly ageist birthday card her coworkers gave her does not plausibly suggest a discriminatory motive at all; rather, it appears to be a good-natured attempt at humor. More troubling is BNY executive Rampersad's assertion at a book discussion that if an employee at BNY had not reached the position she desired by age forty three, she would likely never attain it. Compl. at 13. But that remark does not raise an inference of discriminatory intent either. First, Wheeler does not allege that Rampersad had anything to do with BNY's refusal to give her the promotions she wanted. Cf. Poliard v. Saintilus Day Care Ctr., Inc., No. 11-CV-5174, 2013 WL 1346238, at *4 (E.D.N.Y. Mar. 7, 2013) ("Here, the alleged comments are particularly probative of discriminatory intent because they were made by plaintiff's direct supervisor shortly before plaintiff was terminated, and because they suggest that plaintiff's supervisor based hiring and firing decisions on her assumptions relating to Haitian employees."). Second, for the reasons explained above, any non-time-barred ADEA failure-to-promote claim would have to be premised on acts occurring in early 2015 at the latest, and Rampersad made the remark in June 2013. See Thomson v. Odyssey House, No. 14-CV-3857, 2015 WL 5561209, at *15 (E.D.N.Y. Sept. 21, 2015) ("[W]hile Plaintiffs have alleged that Thomson was subject to criticism from Harris and Brown and that Thomson heard several derogatory comments directed at her and other black women, there is no indication that these comments—made in 2011—were related to the April 2014 termination."). Wheeler also alleges that coworkers told her she looked good for her age and suggested she should be retired. Resp. at 15. These remarks, while clearly inappropriate, appear to be completely unrelated to the

decision making process that led to Wheeler's being denied promotions she sought. Thus, Wheeler's ADEA failure-to-promote claim must be dismissed.

### B. Hostile Work Environment

To state a hostile work environment claim, a plaintiff must first demonstrate that she experienced harassment "sufficiently severe or pervasive to alter the conditions of [her] . . . employment and create an abusive working environment." Alfano, 294 F.3d at 373 (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)). The plaintiff must also show "that a specific basis exists for imputing the objectionable conduct to the employer." Id. A hostile work environment claim has "objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." Id. at 374 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). In evaluating a hostile work environment claim, a court must have some "reason to believe" that the incidents it considers were "motivated by the plaintiff's [protected characteristics]." Sanderson v. N.Y. State Elec. & Gas Corp., 560 F. App'x 88, 92 (2d Cir. 2014); see also Alfano, 294 F.3d at 374 (finding it well established that, in order to state a "sex-based hostile work environment [claim] under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex"). Hostile work environment claims based on the ADEA and Title VII are analyzed under the same legal framework. Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003).

BNY argues that Wheeler's hostile work environment claims must be dismissed, Mem. at 12–13, and the Court agrees. For starters, many of the allegations that Wheeler points to as evidence of a hostile work environment—e.g., fielding questions about the meaning of "equity,"

18

not having a birthday party, and being excluded from a lunch—have no plausible connection to

her age or national origin. They are more properly characterized as "sporadic verbal altercations

and social snubs [that have no discriminatory overtones and] . . . do not indicate conduct so

continuous, threatening, or offensive as to comprise a hostile work environment." Douglass v.

Rochester City Sch. Dist., 873 F. Supp. 2d 507, 409 (W.D.N.Y. 2012), aff'd, 522 F. App'x 5 (2d

Cir. 2013). Since there is no "circumstantial or other basis for inferring" that the facially neutral

incidents recounted in Wheeler's pleadings have any connection to her protected characteristics,

Kaytor v. Elec. Boat Corp., 609 F.3d 537, 547 (2d Cir. 2010) (quoting Alfano, 294 F.3d at 378),

the Court will not consider them in determining whether she has stated a plausible hostile work

environment claim.

Wheeler does allege several incidents that suggest discrimination on the basis of national

origin or age, but they do not add up to a plausible hostile work environment claim. She asserts

that her colleagues mocked her accent, told her she looked good for her age, and suggested she

should retire. Resp. at 15. For one thing, "comments or questions about retirement, without more,

do not create a hostile work environment." Mazur v. N.Y.C. Dep't of Educ., 53 F. Supp. 3d 618,

635 (S.D.N.Y. 2014). But more significantly, Wheeler does not say when or how often these

remarks were made, an omission that prevents the Court from assessing the plausibility of a

hostile work environment premised on the remarks. See George v. Prof. Disposables Int'l, Inc.,

No. 15-CV-3385, 2016 WL 3648371, at *7 (S.D.N.Y. June 1, 2016) ("The pleading does not

even provide a timeframe during which the alleged age-based hostile work environment might

have existed."); Yan v. Ziba Mode Inc., No. 15-CV-47, 2016 WL 1276456, at *6 (S.D.N.Y. Mar.

29, 2016) (holding that the plaintiff's hostile work environment claims were deficient because,

among other things, "he fail[ed] to specify how often the[ derogatory] comments were directed at him").

 From the end of 2011 to June 2012, Wheeler's team leader and unit manager "repeatedly stated [that] they cannot stand . . . th[ose] people, when speaking with Mexican clients or employee[s] located there." Compl. at 8, 13. And at some point, Iris Denisse Ortiz, apparently one of Wheeler's superiors, responded to a "neighbor[ing] team['s]" complaints about "screaming tones" in Wheeler's team's work area by claiming that a "high volume tone" is part of Hispanic culture. Resp. at 10. Finally, BNY executive Rampersad suggested at a book discussion that a BNY employee who did not hold the position she desired by age forty-three would probably never attain it. Compl. at 13. These incidents involved offensive conduct, but it is well established that "'[c]onduct that is merely offensive and not severe or pervasive enough to create an objectively hostile or abusive work environment' will not establish a Title VII discrimination claim." Wingfield v. Rochester Sch. for the Deaf, No. 13-CV-6321, 2013 WL 5475708, at *4 (W.D.N.Y. Sept. 30, 2013) (quoting Torres v. Pisano, 116 F.3d 625, 631 (2d Cir. 1997)). Further, Wheeler has not alleged any facts plausibly suggesting that this conduct was "physically threatening or humiliating," that it "unreasonably interfered with [her] work," or that she endured "psychological harm" as a result. Sotomayor v. City of New York, 862 F. Supp. 2d 226, 260 (E.D.N.Y. 2012) (quoting Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d 73, 82 (2d Cir. 2009)). Accordingly, Wheeler's hostile work environment claims must be dismissed.

### C. Retaliation

Under Title VII, an employer may not discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he

has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." § 2000e-3(a). "The Court analyzes retaliation claims under the ADEA using the same 'burden-shifting' formula from Title VII employment discrimination claims." Bohnet v. Valley Stream Union Free Sch. Dist. 13, 30 F. Supp. 3d 174, 181 (E.D.N.Y. 2014). "To establish a prima facie case of retaliation, an employee must show '(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'" Terry, 336 F.3d at 141 (quoting Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998)).

"The Supreme Court has held that in the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90 (2d Cir. 2015) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII." Id.; see also Burlington N., 548 U.S. at 64 ("[T]he antiretaliation provision, unlike the substantive provision [forbidding discrimination], is not limited to discriminatory actions that affect the terms and conditions of employment."). The expanded definition of adverse employment action for purposes of Title VII retaliation claims applies to ADEA retaliation cases as well. Witkowich v. U.S. Marshal Serv., 424 F. App'x 20, 22 (2d Cir. 2011).

A plaintiff can prove causation "'indirectly by showing that the protected activity was followed closely by' the adverse employment action." Blanco v. Brogan, 620 F. Supp. 2d 546,

554 (S.D.N.Y. 2009) (quoting <u>Davis v. State Univ. of N.Y.</u>, 802 F.2d 638, 642 (2d Cir. 1986)).

"Where . . . a plaintiff relies exclusively on timing to plead causation, the temporal proximity between the protective activity and adverse employment action must be 'very close.'" <u>Vale v. Great Neck Water Pollution Control Dist.</u>, 80 F. Supp. 3d 426, 441 (E.D.N.Y. 2015) (quoting <u>Clark Cty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001)). "[C]ourts in this Circuit have found delays of about six weeks to allow . . . an inference [of causation]." <u>Flood v. UBS Global Asset Mgmt., Inc.</u>, No. 10-CV-374, 2012 WL 288041, at *17 (S.D.N.Y. Feb. 1, 2012) (collecting cases); <u>see also, e.g.</u>, <u>Johnson v. County of Nassau</u>, 480 F. Supp. 2d 581, 603 (E.D.N.Y. 2007) ("Because the adverse actions allegedly began to occur within weeks of this meeting, the Court finds that a rational factfinder could infer a causal connection between the alleged adverse actions suffered by Plaintiff and the protected activity.").

BNY argues for dismissal of Wheeler's retaliation claim on two grounds: "she has not sufficiently pleaded the existence of an adverse employment action or the requisite causal connection." Mem. at 13. The Court disagrees on both counts. Thus, Wheeler's retaliation claim survives.

Wheeler alleges that two or three weeks after calling "the company ethics hot line" on December 29, 2014, to report discrimination she had experienced at BNY, she was falsely accused of threatening a fellow employee in a stairwell. Compl. at 10; Resp. at 10. In her words, "Corporate Security" met with her, "treated her as a criminal," and "pressured [her] to accept something that [she] didn't do." Resp. at 10. BNY is correct that in her Complaint, Wheeler does not specifically deny the accusation that she threatened a coworker, Mem. at 13, but her Response makes it clear that she intends to allege she never threatened anybody, Resp. at 31. As

noted above, the Court is entitled to consider the Response in deciding BNY's Motion. See Ibok, 2006 WL 302336, at *1 n.1 ("The Court may consider the factual allegations in plaintiff's Response to supplement those in his complaint because of the liberal standard afforded to the pleadings of pro se litigants."). A reasonable employee would be dissuaded from complaining about discrimination if she knew that her complaints would prompt her employer to falsely accuse her of threatening a coworker and to pressure her to admit to doing so. See, e.g., DeVore v. Neighborhood Hous. Servs. of Jamaica Inc., No. 15-CV-6218, 2017 WL 1034787, at *10 (E.D.N.Y. Mar. 16, 2017) ("Plaintiff has listed several adverse actions that Defendant took against him, including . . . retaliatory write-ups for infractions that had not happened . . . ."); Perrin v. Conn. Dep't of Corr., No. 16-CV-643, 2016 WL 6594070, at *2 (D. Conn. Nov. 7, 2016) ("[I]f it is true that plaintiff's supervisors decided for retaliatory reasons to initiate disciplinary proceedings against plaintiff on grounds they knew to be false, I cannot help but conclude that this tactic would . . . dissuade any reasonable employee from complaining about discrimination."). Further, courts have found false accusations to constitute adverse employment actions in the First Amendment retaliation context. See, e.g., Shanks v. Vill. of Catskill Bd. of Trustees, 653 F. Supp. 2d 158, 166 (N.D.N.Y. 2009) ("'[L]esser actions' such as negative reviews, *false accusations*, and menial job assignments 'may also be considered adverse employment actions.'" (emphasis added) (quoting Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 226 (2d Cir. 2006))). That is important because the "standard for First Amendment retaliation claims has always been the equivalent to the standard set forth in Burlington Northern" with respect to Title VII and ADEA retaliation claims. Zelnik, 464 F.3d at 227.

Wheeler has also sufficiently alleged a causal connection between her decision to report discrimination via the company hotline and the adverse employment action that followed. Two or three weeks after she made the call, she faced the false accusations. Compl. at 10. As noted above, courts in this circuit have regularly inferred causation where the temporal gap is around six weeks. Flood, 2012 WL 288041, at *17. And in the First Amendment retaliation context, the Second Circuit has held that a temporal gap of six weeks easily satisfies the causation requirement. Nagle v. Marron, 663 F.3d 100, 111 (2d Cir. 2011). The Court is therefore satisfied that Wheeler has plausibly alleged a causal connection between her protected activity and the adverse employment action she experienced. See, e.g., Erasmus v. Deutsche Bank Ams. Holding Corp., No. 15-CV-1398, 2015 WL 7736554, at *12 (S.D.N.Y. Nov. 30, 2015) (holding that temporal gaps of two weeks and one month "support a causal inference of retaliation sufficient to survive a motion to dismiss"). Accordingly, Wheeler's retaliation claim survives.[7]

### D. Opportunity to Amend

A court "should not dismiss [a pro se complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000) (quoting Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999)). The Court must dismiss Wheeler's ADEA failure-to-promote claim and her ADEA and Title VII hostile work environment claims. But there is no

---

[7]   BNY did not move to dismiss Wheeler's retaliation claim on the ground that it is time barred. Mem. at 11–12. Thus, the Court need not address that argument. See Bowen-Hooks v. City of New York, 13 F. Supp. 3d 179, 203 (E.D.N.Y. 2014) (finding that because the defendants "did not move to dismiss [certain] claims based on Plaintiff's failure to exhaust her administrative remedies" and instead addressed the merits of the claims in their summary judgment briefing, the court would deem the exhaustion argument waived).

reason to think that amending the Complaint would be futile, so the Court grants Wheeler leave to amend her pleadings to cure the deficiencies identified in these claims.

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that BNY's motion to dismiss (Dkt. No. 13) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED**, that Wheeler's ADEA failure-to-promote claim and her ADEA and Title VII hostile work environment claims are **DISMISSED with leave to amend**; and it is further

**ORDERED**, that if Wheeler wishes to proceed with the claims the Court dismisses, she must file an amended complaint as set forth above within **thirty days** of the filing date of this Memorandum-Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:        June 14, 2017
              Albany, New York


Lawrence E. Kahn
U.S. District Judge